## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL
DIVERSITY
1411 K Street NW, Suite 1300
Washington, D.C. 20005

           *Plaintiff*,

    v.

U.S. DEPARTMENT OF INTERIOR,
1849 C Street NW, Washington, DC
20240; DOUG BURGUM in his official
capacity as Secretary of Interior, 1849 C
Street NW, Washington, D.C. 20240;

U.S. BUREAU OF LAND
MANAGEMENT, 1849 C Street NW,
Washington, DC 20240; JOHN RABY, in
his official capacity as Acting Director of
BLM, 1849 C Street NW, Washington, DC
20240;

BUREAU OF OCEAN ENERGY
MANAGEMENT, 1849 C Street NW,
Washington, DC 20240; WALTER
CRUICKSHANK, in his official capacity
as Deputy Director of BOEM, 1849 C
Street NW, Washington, DC 20240;

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street NW, Washington, DC
20240; PAUL SOUZA in his official
capacity as Acting Director of FWS, 1849
C Street NW, Washington, DC 20240;

NATIONAL PARK SERVICE, 1849 C
Street NW, Washington, DC 20240;
JESSICA BOWRON in her official
capacity as Acting Director of NPS, 1849
C Street NW, Washington, DC 20240;

U.S. DEPARTMENT OF
AGRICULTURE,

Civil Case No. 1:25-cv-00612-BAH

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

1400 Independence Ave SW, Washington,
DC 20250; BROOKE ROLLINS in her
official capacity as Secretary of
Agriculture, 1400 Independence Ave SW,
Washington, DC 20250;

ANIMAL AND PLANT HEALTH
INSPECTION SERVICE, 4700 River Rd,
Riverdale, MD 20737; MICHAEL
WATSON in his official capacity as
Administrator of APHIS, 4700 River Rd,
Riverdale, MD 20737;

U.S. FOREST SERVICE, 1400
Independence Ave SW, Washington, DC
20250; RANDY MOORE in his official
capacity as Chief of USFS, 1400
Independence Ave SW, Washington, DC
20250;

U.S. DEPARTMENT OF COMMERCE,
1401 Constitution Ave, NW, Washington,
DC 20230; HOWARD LUTNICK in his
official capacity as Secretary of Commerce,
1401 Constitution Ave, NW, Washington,
DC 20230;

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION,
1401 Constitution Avenue NW, Room
5128 Washington, DC 20230; NANCY
HANN in her official capacity as Acting
Administrator of NOAA, 1401 Constitution
Avenue NW, Room 5128 Washington, DC
20230;

U.S. DEPARTMENT OF
TRANSPORTATION, 200 New Jersey
Avenue, SE Washington, DC 20590;
SEAN DUFFY in his official capacity as
Secretary of Transportation, 200 New
Jersey Avenue, SE Washington, DC 20590;

FEDERAL AVIATION
ADMINISTRATION, 800 Independence
Ave SW, Washington, DC 20591; CHRIS

ROCHELEAU in his official capacity as
Acting Administrator of the FAA, 800
Independence Ave SW, Washington, DC
20591;

U.S. ENVIRONMENTAL PROTECTION
AGENCY, 1200 Pennsylvania Ave NW,
Washington, DC 20004; and LEE ZELDIN
in his official capacity as Administrator of
the Environmental Protection Agency,
1200 Pennsylvania Ave NW, Washington,
DC 20004.

*Defendants.*

## INTRODUCTION

1.      This case involves violations of key federal statutes designed to ensure and promote transparency and accountability in government – the Federal Advisory Committee Act ("FACA") and the Freedom of Information Act ("FOIA"). Defendants have disregarded critical obligations outlined in these Sunshine laws, neglecting their duty to make information on the actions of the Department of Government Efficiency (DOGE) Teams operating within the Defendant agencies accessible to the public as required by law. These actions represent a clear breach of the principles of open government established in FACA and FOIA.

2.      Specifically, this case concerns a flagrant violation of FACA, which requires transparency, open public participation, and balanced representation when the President or executive branch agencies establish or use non-federal bodies for the purpose of seeking advice or recommendations. Here, President Trump issued Executive Order 14158 (the "DOGE EO") establishing a "Department of Government Efficiency" ("DOGE") by renaming the United States Digital Service as the United States DOGE Service ("USDS"), which is intended to drive large scale structural change in the scope and function of the executive branch. As part of that effort, the DOGE EO requires all federal agencies to establish "DOGE Teams," in consultation

with USDS, to work within the agencies to implement the President's "DOGE Agenda." These DOGE Teams—which are "advisory committees" as that term is defined under FACA—will be controlled by Elon Musk, whom President Trump engaged to oversee DOGE's efforts, creating the potential for massive conflicts of interest, including by potentially undermining agencies investigating his companies, and providing opportunities to benefit from government contracts and avoid regulatory requirements. However, Defendants have failed to ensure that the DOGE Teams comply with the balance and openness requirements of FACA, which is necessary to avoid conflicts of interest and ensure that the DOGE teams are not being used for personal gain.

3.     When passing FACA, Congress explained that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496. Indeed, the statute expressly provides that "appropriate" steps must be taken to "assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest . . . ." 5 U.S.C. § 1004(b)(3).

4.     To accomplish these purposes, FACA requires advisory committees to file a charter with the head of the agency to whom the committee reports setting forth, among other information, the committee's objectives and the scope of its activity, and a description of the duties for which the committee is responsible and the authority for those duties. 5 U.S.C. § 1008(c). 5 U.S.C. § 1004 further states "the membership of the advisory committee is to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee," which requires the development of a Membership Balance Plan. *See* 41 C.F.R. § 102-3.60(b)(3).

5.      That is especially critical here given Mr. Musk's control over DOGE's efforts to reform our government and his influence over the DOGE Teams that will be implementing the "DOGE Agenda" from within the agencies, which includes across-the-board regulatory recissions, administrative reductions of the federal work-force, and massive spending reductions to the federal budget.

6.      Mr. Musk and other billionaire and tech executives working with DOGE stand to benefit personally and financially from the DOGE Teams' work, including by securing government contracts, slashing environmental rules that apply to their companies, and reducing the government's regulatory capacity and authority, including by targeting specific agencies, statutes, and spending decisions that affect their businesses. Indeed, on February 19, 2025, President Trump issued another Executive Order—E.O. 14219—giving the DOGE Teams authority to rescind regulations across the government, including those it deems are impeding technological innovation and infrastructure development—recissions that Mr. Musk and others associated with DOGE would clearly benefit from. It is therefore vital that the DOGE Teams' actions—in particular their efforts to dismantle essential regulatory protections intended to safeguard the public health and the environment—be made transparent to the public.

7.      Pursuant to the DOGE EO, all federal agencies must establish these DOGE Teams, and reports indicate that DOGE Teams have already been established and are working within various federal agencies. For example, Secretary Brooke Rollins recently confirmed that a DOGE Team had been established at the U.S. Department of Agriculture, and reports have stated that DOGE Teams have been actively working within the Environmental Protection Agency and the Federal Aviation Administration.

8.      Further, recent reporting indicates that Mr. Musk is using his influence over the DOGE teams to rapidly consolidate control over large swaths of the federal government, sideline career officials, gain access to sensitive databases, and dismantle agencies and regulatory systems. Since President Trump assumed office—and without any congressional approval—the world's richest man has created an alternative power structure inside the federal government for the purpose of controlling spending and pushing out employees. Meanwhile, Musk has been named as a special government employee, which subjects him to less stringent rules on ethics and financial disclosures regarding his role overseeing DOGE and the DOGE Teams.

9.      Therefore, to ensure that Mr. Musk and others are not using the DOGE Teams to promote their self-interest and unduly exert improper influence over essential agency functions, it is crucial that Defendants comply with FACA in their establishment and utilization of the DOGE Teams. However, Defendants have failed to provide the public with a charter and Membership Balance Plan for the DOGE Teams, as required by FACA. Although  FACA requires that an advisory committee must make publicly available any and all documents made available to or prepared for or by such committees, 5 U.S.C. § 1009(b), along with detailed meeting minutes containing a complete and accurate description of matters discussed and conclusions reached, 5 U.S.C. § 1009(c), Defendants have not provided any such documents or meeting minutes to the public for the work of their DOGE Teams, in direct violation of FACA.

10.     Alongside the FACA violations, this case also concerns several of the Defendants' failure to fulfill their obligations under FOIA, which requires federal agencies to disclose agency records that are requested by the public, unless exempted by law. 5 U.S.C. § 552(a). The records at issue include communications between federal agency employees and USDS, DOGE Team(s), or any other individual purporting to work for USDS as well as other

related materials such as calendars or meeting schedules. These records are subject to FOIA, and their relevance is extremely time sensitive given DOGE's ongoing efforts to refashion the federal government and its workforce with no or very minimal transparency. Plaintiff submitted its FOIA requests on February 5, 2025, and a determination on the request was due by March 5, 2025. However, Plaintiff has not received a determination or any responsive records to date.

11.     In the absence of compliance with FOIA's and FACA's openness requirements, Plaintiff and the public have no way of ascertaining how or whether Defendants have taken appropriate steps to ensure that the DOGE Teams will remain fairly balanced, and whether Mr. Musk has been using, or will use, his control over the DOGE Teams to support the private interests of himself and the others that stand to profit from DOGE's work.

12.     The Court should therefore require Defendants to immediately comply with FOIA's and FACA's requirements, including by compelling disclosure of the FOIA records at issue and taking all necessary steps to ensure the disclosure of all materials that FACA requires be made available to the public.

## JURISDICTION AND VENUE

13.     Jurisdiction is conferred on this Court by 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. §§ 1331 and 1361 because this action arises under federal law, specifically the Freedom of Information Act, 5 U.S.C. § 552, Federal Advisory Committee Act, 5 U.S.C. § 1001 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. The Court has jurisdiction under 28 U.S.C. § 1361 to issue mandamus relief against Defendants.

14.     Venue is proper in this judicial district because this case is brought under FOIA, and the offices of the requested records are located in this district. 5 U.S.C. § 552(a)(4)(B). Venue is also proper pursuant to 28 U.S.C. §§ 1391(b) and (e) because all Defendants reside in

this district, where a substantial part of the acts and omissions giving rise to this action took place.

## PARTIES

### Plaintiff

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a national nonprofit organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 79,000 members worldwide. The Center has worked for decades to safeguard habitats for people, plants, and animals and to maintain and increase protections for public health, public lands, communities, and for a livable climate. The Center's members value and benefit from rare species' continued existence in the wild and are harmed by industrial development and associated trends like global climate change, water degradation, and habitat loss that threaten wild species' survival and recovery. The Center is headquartered in Tucson, Arizona, with offices in Washington, D.C., California, Florida, and Oregon.

16.     The Center brings this suit on its own behalf and on behalf of its members, whose interests are directly affected by DOGE's activities and stated goals, which are across-the-board regulatory recissions, administrative reductions of the federal workforce, and massive spending reductions to the federal budget that will impede the ability of the government to enforce laws and regulations intended to protect people and the environment, thereby harming the interests of the Center and its members.

17.     The Center has worked for decades to safeguard the public and the environment from the ravages of industrial development and to defend the laws and regulations that protect the environment. On information and belief—and consistent with President Trump's February

19, 2025, Executive Order—the DOGE Teams working within the Defendant agencies seek to target the statutes and regulations that the Center and its members rely on for environmental protection—such as the National Environmental Policy Act, the Endangered Species Act, the Marine Mammal Protection Act, and many other statutes and regulations overseen by Defendants that protect the environment and public health—and to reduce the federal workforce and budget in a manner that will impede regulatory oversight of activities that harm the environment and public health by precluding the ability of Defendants to enforce such laws and regulations. Plaintiff relies on these laws and regulations to achieve its organizational purposes, including monitoring the impacts of agency actions on the environment and species; monitoring legal compliance concerning environmental management; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitats and wildlife. The Center therefore has a direct interest in the openness, accountability, integrity, balance, and legal legitimacy of DOGE and the DOGE Teams working within the Defendant agencies.

18.    The Center has brought many lawsuits on behalf of its members—some of which are still pending—against all named Defendants for the enforcement of environmental laws and regulations that are affected by the actions of the DOGE Teams. Any attempts by the DOGE Teams to undermine these environmental laws and associated regulations, including by reducing agency budgets and workforce and thereby undercutting Defendants' ability to apply and enforce such laws and regulations, would therefore delay, avoid, and undermine protections that are necessary to secure Plaintiff's well-established interests in protecting the public health, habitats, and wildlife impacted by federal activities.

19.    DOGE has already undertaken efforts that directly affect Plaintiff's well-established interests. For example, it was reported that Mr. Musk recently undertook efforts to have the Department of the Interior ("DOI") fire at least 2,300 employees across the Department. This is already having significant negative impacts on the ability these agencies to protect endangered species, manage wildlife refuges and other public lands, and protect resources held in trust for the public. These actions will continue to cause severe harms to the Department's ability to conserve and manage the nation's natural resources, which Plaintiff has worked for decades to protect.

20.    Mr. Musk has also publicly criticized the Fish and Wildlife Service ("FWS") claiming their Endangered Species Act ("ESA") review process—including for his own company SpaceX's activities—was "unacceptable." It has also been reported that Mr. Musk will be targeting the Federal Aviation Administration's ("FAA") commercial spaceflight office for budget cuts and other reform. The FAA is required to conduct NEPA review of Mr. Musk's SpaceX launches and operations to ensure that the environment, species, and their habitats are not significantly adversely affected by Space X's activities, and has proposed fines and grounded SpaceX rockets after explosions. In response, Mr. Musk posted on X, "[t]he fundamental problem is that humanity will forever be confined to Earth unless there is radical reform at the FAA!" Plaintiff has active litigation against the FAA and SpaceX to protect the habitats and wildlife surrounding the SpaceX facility in Texas, and therefore the DOGE Teams' efforts to undermine the FAA's and FWS's ability to apply and enforce laws such as NEPA or the ESA review process would directly affect Plaintiff's interests and ongoing efforts to protect the environment from SpaceX's activities.

21.    The Center has also brought numerous lawsuits against Defendant agencies such as the Bureau of Land Management ("BLM"), the National Park Service ("NPS"), the Bureau of Ocean Energy Management ("BOEM"), the National Oceanic and Atmospheric Administration ("NOAA"), the Forest Service, and FWS for delayed species listings and the approval of projects or activities that threaten species and their habitats. The massive layoffs spearheaded by DOGE and the DOGE Teams will make it drastically more difficult for these agencies to effectuate their purposes and conduct the environmental reviews required for the preservation of threatened and endangered species and their habitats, directly undermining Plaintiff's central organizational mission.

22.    On February 6, 2025, the Center sent a letter to the Secretary of Agriculture, the Secretary of Commerce, the Secretary of Interior, and the EPA Administrator objecting to the lack of publicly available information about the DOGE Teams, and demanding that they provide the charter, Balanced Management Plan, meeting documents and minutes, and other materials that FACA requires to be made publicly available.

23.    On February 14, 2025, the Center sent a similar letter to the Secretary of Transportation objecting to the lack of publicly available information about the DOGE Teams, and demanding that they provide the charter, Balanced Management Plan, meeting documents and minutes, and other materials that FACA requires to be made publicly available.

24.    In these FACA letters the Center raised concerns about the potential for conflicts of interest, and stated that the only way to ensure that the government is not inappropriately influenced by DOGE Teams is to provide such documents, plans, and meeting minutes as required by FACA.

25.     The Center further stated that, in order to ensure that the DOGE Teams are fairly balanced in terms of the points of view represented and to avoid undue influence by special interests, it is imperative that the DOGE Teams include members representing the environmental advocacy community's interest in ensuring that the environment and public health are adequately protected. Given the Center's long history of working to safeguard the communities, wildlife, and the regulatory systems that Defendants oversee and that may be affected by the DOGE Agenda, the Center requested to be included on any DOGE Teams established within the Defendant agencies, in order to provide input as to how they may pursue their missions to protect wildlife, the environment, and public health more efficiently.

26.     Defendants have not responded to the Center's FACA letters and have failed to make the required documents and meeting minutes publicly available as FACA requires. Defendants' failure to comply with FACA's transparency and other requirements has harmed, and will continue to harm, the Center and its members' interests, including by depriving them of information necessary to understand and respond to the DOGE Teams' work and obviating their ability to determine whether the DOGE Teams are being improperly influenced by special interests. This injury would be remedied if this Court were to require Defendants to comply with FACA.

27.     The Center is also the requester of the information and records at issue pursuant to FOIA. On February 5, 2025, the Center submitted FOIA requests to NOAA, DOI, EPA, and USDA ("FOIA Defendants"), requesting records related to communications between federal agency employees and USDS, the U.S. DOGE Service Temporary Organization, and the DOGE Team(s), as well as calendars and/or schedules, for individuals working with a U.S. DOGE

Team. FOIA Defendants have not made a determination on the February 5, 2025, FOIA request nor have they disclosed any responsive records to date.

28.    The FOIA Defendants' failure to disclose the requested records responsive to the Center's FOIA request harms the organization and its members, precluding the Center from understanding important information about the agencies' communications with DOGE and their plans for eliminating staff, budgets, and regulations that the Center relies on to protect water, wildlife, public lands, the climate, and vulnerable communities.

29.    This information and the Center's subsequent analyses of it, will help to inform and prioritize the Center's organizational mission, including determining where to direct resources and develop alternate strategies. The Center will also share the requested information with its members and the public in general to keep them informed about mounting threats to clean air and water, wildlife and nature protections, public lands, climate, and vulnerable communities and potential avenues for response. The requested records will also be used to inform Congressional representatives and their staffs about threats to the environment.

30.    The FOIA Defendants' failure to comply with FOIA has therefore harmed, and will continue to harm, the Center's and its members' interests, including by depriving them of information necessary to understand and respond to the DOGE Teams' work. This injury would be remedied if this Court were to compel FOIA Defendants to promptly disclose the records requested under FOIA.

### **Defendants**

31.    Defendant UNITED STATES DEPARTMENT OF INTERIOR ("DOI") is a cabinet-level agency within the executive branch of the U.S. government that is responsible for the conservation and management of the nation's natural resources, including its public lands,

endangered species, mineral estates, and cultural heritage. DOI spearheads several agencies

including the Bureau of Land Management ("BLM"), U.S. Fish and Wildlife Service ("FWS"),

the Bureau of Ocean Energy Management ("BOEM"), and the National Park Service ("NPS").

DOI has been directed by the Office of the President to establish a DOGE Team for the

implementation of the DOGE agenda. DOI is responsible for ensuring all DOI DOGE Teams'

compliance with FACA. DOI also possesses and controls records the Center seeks under FOIA

and is an agency subject to FOIA. *See* 5 U.S.C. § 552(f) (defining "agency" to include "any

executive department … or other establishment in the executive branch of the Government").

      32.     Defendant DOUG BURGUM is the Secretary of Interior and is being sued in his

official capacity. As the "Agency Head" of DOI, Secretary Doug Burgum is responsible for

ensuring DOI's compliance with FOIA and all DOI DOGE Teams' compliance with FACA.

      33.     Defendant BUREAU OF LAND MANAGEMENT is an agency within the

Department of the Interior responsible for managing federal public lands and resources,

including federal onshore oil and gas resources and the development of those resources. As the

principal agency for the BLM DOGE Team, BLM is responsible for ensuring the BLM DOGE

Team's compliance with FACA.

      34.     Defendant JOHN RABY is the Acting Director of BLM being sued in his official

capacity. As the "Agency Head" of BLM, John Raby is responsible for ensuring the BLM

DOGE Team's compliance with FACA.

      35.     Defendant U.S. FISH AND WILDLIFE SERVICE manages and conserves fish,

wildlife, plants, and their habitats. As the principal agency for the FWS DOGE Team, FWS is

responsible for ensuring the FWS DOGE Team's compliance with FACA.

36.     Defendant PAUL SOUZA is the Acting Director of the U.S. Fish and Wildlife Service being sued in [their] official capacity. As the "Agency Head" of FWS, Paul Souza is responsible for ensuring the FWS DOGE Team's compliance with FACA.

37.     Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is responsible for managing the development of U.S. offshore energy and mineral resources. As the principal agency for the BOEM DOGE Team, BOEM is responsible for ensuring the BOEM DOGE Team's compliance with FACA.

38.     Defendant WALTER CRUICKSHANK is the Deputy Director of the Bureau of Ocean Energy Management being sued in his official capacity. As the "Agency Head" of BOEM, Deputy Director Walter Cruickshank is responsible for ensuring the BOEM DOGE Team's compliance with FACA.

39.     Defendant NATIONAL PARK SERVICE manages and preserves the natural and cultural resources of U.S. national parks. As the principal agency for the NPS DOGE Team, NPS is responsible for ensuring the NPS DOGE Team's compliance with FACA.

40.     Defendant JESSICA BOWRON is the Acting Director of the National Park Service being sued in her official capacity. As the Acting "Agency Head" of NPS, Director Jessica Bowron is responsible for ensuring the NPS DOGE Team's compliance with FACA.

41.     Defendant UNITED STATES DEPARTMENT OF AGRICULTURE ("USDA") is a cabinet-level agency within the executive branch of the United States government that manages and regulates food, agricultural production, and natural resources. USDA spearheads federal agencies like the Animal and Plant Health Inspection Service ("APHIS") and the U.S. Forest Service ("USFS"). USDA has been instructed by the Office of the President to establish a DOGE Team for the implementation of the DOGE agenda. USDA is responsible for ensuring all

USDA DOGE Teams' compliance with FACA. USDA also possesses and controls records the Center seeks under FOIA and is an agency subject to FOIA. *See* 5 U.S.C. § 552(f) (defining "agency" to include "any executive department…or other establishment in the executive branch of the Government").

42.    Defendant BROOKE ROLLINS is the Secretary of Agriculture and is being sued in her official capacity. As the "Agency Head" of USDA, Secretary Brooke Rollins is responsible for ensuring USDA's compliance with FOIA and all USDA DOGE Teams' compliance with FACA.

43.    Defendant ANIMAL AND PLANT HEALTH INSPECTION SERVICE ("APHIS") is a federal agency within the USDA responsible for protecting the health of U.S. agriculture and animals by managing wildlife and preventing the spread of pests and diseases through oversight and regulation. As the principal agency for the APHIS DOGE Team, APHIS is responsible for ensuring the APHIS DOGE Team's compliance with FACA.

44.    Defendant DR. MICHAEL WATSON is the Administrator of APHIS being sued in his official capacity. As the "Agency Head" of APHIS, Administrator Dr. Michael Watson is responsible for ensuring the APHIS DOGE Team's compliance with FACA.

45.    Defendant U.S. FOREST SERVICE ("Forest Service") is a federal agency within the USDA responsible for managing millions of acres of national forests. As the principal agency for the Forest Service DOGE Team, the Forest Service is responsible for ensuring the Forest Service DOGE Team's compliance with FACA.

46.    Defendant RANDY MOORE is the Chief of the Forest Service being sued in his official capacity. As the "Agency Head" of Forest Service, Chief Randy Moore is responsible for ensuring the Forest Service DOGE Team's compliance with FACA.

47.     Defendant UNITED STATES DEPARTMENT OF COMMERCE ("DOC") is a cabinet-level agency within the executive branch of the United States government responsible for conserving most marine species and managing ocean resource use, as well as weather and climate forecasting. DOC spearheads federal agencies like the National Oceanic and Atmospheric Administration ("NOAA"). DOC has been instructed by the Office of the President to establish a DOGE Team for the implementation of the DOGE agenda. DOC is responsible for ensuring all DOC DOGE Teams' compliance with FACA.

48.     Defendant HOWARD LUTNICK is Acting Secretary of Commerce and is being sued in his official capacity. As the Acting "Agency Head" of DOC, Secretary Howard Lutnick is responsible for ensuring all DOC DOGE Teams' compliance with FACA.

49.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION ("NOAA") is a federal agency within the Department of Commerce responsible for studying and predicting changes in environment, managing coastal and marine resources, as well as providing the public with essential environmental information. As the principal agency for the NOAA DOGE Team, NOAA is responsible for ensuring the NOAA DOGE Team's compliance with FACA. NOAA also possesses and controls records the Center seeks under FOIA and is an agency subject to FOIA. *See* 5 U.S.C. § 552(f) (defining "agency" to include "any executive department…or other establishment in the executive branch of the Government").

50.     Defendant VICE ADMIRAL NANCY HANN is the Administrator of NOAA being sued in her official capacity. As the "Agency Head" of NOAA, Administrator Vice Admiral Nancy Hann is responsible for ensuring NOAA's compliance with FOIA and the NOAA DOGE Team's compliance with FACA.

51.     Defendant UNITED STATES DEPARTMENT OF TRANSPORTATION oversees and administers transportation programs, including aviation and surface transportation. DOT spearheads several agencies including the Federal Aviation Administration ("FAA") and has been directed by the Office of the President to establish a DOGE Team for the implementation of the DOGE agenda. DOT is responsible for ensuring all DOT DOGE Teams' compliance with FACA.

52.     Defendant SEAN DUFFY is the Secretary of Transportation being sued in his official capacity. As the "Agency Head" of DOT, Secretary Sean Duffy is responsible for ensuring all DOT DOGE Teams' compliance with FACA.

53.     Defendant FEDERAL AVIATION ADMINISTRATION regulates civil aviation and commercial space transportation in the United States including construction, operation, safety, and air traffic control. As the principal agency for the FAA DOGE Team, FAA is responsible for ensuring the FAA DOGE Team's compliance with FACA.

54.     Defendant CHRIS ROCHELEAU is the Acting Administrator of the Federal Aviation Administration being sued in his official capacity. As the Acting "Agency Head" of the FAA, Administrator Chris Rocheleau is responsible for ensuring the FAA DOGE Team's compliance with FACA.

55.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA") is an agency of the U.S. government that has been directed by the Office of the President to establish a DOGE Team for the implementation of the DOGE agenda. EPA is responsible for protecting human health and the environment through technical assistance, environmental surveillance, inspection, and investigation. As the principal agency for the EPA DOGE Team, EPA is responsible for ensuring the EPA DOGE Team's compliance with FACA.

EPA also possesses and controls records the Center seeks under FOIA and is an agency subject to FOIA. *See* 5 U.S.C. § 552(f) (defining "agency" to include "any executive department…or other establishment in the executive branch of the Government").

56.    Defendant LEE ZELDIN is the Administrator of EPA and is being sued in his official capacity. As the "Agency Head" of EPA, Administrator Lee Zeldin is responsible for ensuring EPA's compliance with FOIA and the EPA DOGE Team's compliance with FACA.

## LEGAL BACKGROUND

### The Federal Advisory Committee Act

57.    FACA was intended to address congressional concern with the growing number and use of advisory committees. Congress found, among other things, that committees "should be established only when they are determined to be essential" and that "Congress and the public" should be kept abreast of their activities. 5 U.S.C. § 1002. "FACA's principal purpose was to establish procedures aimed at enhancing public accountability of federal advisory committees." *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 446 (1989); *Washington Legal Foundation v. United States Dep't of Justice*, 691 F. Supp. 483, 490 (D.D.C. 1988) (the purpose of FACA is to open to public scrutiny the manner in which the government obtains advice from private individuals).

58.    FACA therefore demands transparency and open public participation when the executive branch establishes or uses non-federal bodies for the purpose of seeking advice or recommendations. When passing FACA, Congress explained that "[o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns." H.R. Rep. No. 92-1017, at 6 (1972), *as reprinted in* 1972 U.S.C.C.A.N. 3491, 3496.

59.     FACA applies to any "committee, board, commission, council, conference, panel, task force, or other similar group," that is "established or utilized to obtain advice or recommendations for the President or one or more agencies or officers of the Federal Government," denominating such groups as "advisory committees." 5 U.S.C. § 1001(2)(A). Only those committees that are "composed wholly of full-time, or permanent parttime, officers or employees of the Federal Government," (i.e., not volunteers or temporary Special Government Employees, such as Mr. Musk) fall outside the definition of "advisory committee" under the Act. 5 U.S.C. § 1001(2)(B).

60.     An advisory committee "shall not meet or take any action until an advisory committee charter has been filed" with the "head of the agency to whom any advisory committee reports," 5 U.S.C. § 1008(c). The advisory committee charter must also be filed with the Library of Congress and the Secretariat. *See* 41 C.F.R. § 102-3.70(a)(3)–(4). The Charter must include, among other information, "the committee's objectives and the scope of its activity;" "a description of the duties for which the committee is responsible, and, if the duties are not solely advisory, a specification of the authority for the duties;" "the estimated annual operating costs for the committee in dollars and person-years;" and "the estimated number and frequency of committee meetings." 5 U.S.C. § 1008(c)(2).

61.     FACA also requires "the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee" and "contain appropriate provisions to assure that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment." 5 U.S.C. § 1004; *see also* 41 C.F.R. §§ 102-3.30, 102-3.60.

62.     This requires the development of a Membership Balance Plan. *See* 41 C.F.R. §

102-3.60(b)(3). The plan must "ensure that, in the selection of members for the advisory

committee, the agency will consider a cross-section of those directly affected, interested, and

qualified, as appropriate to the nature and functions of the advisory committee. Advisory

committees requiring technical expertise should include persons with demonstrated professional

or personal qualifications and experience relevant to the functions and tasks to be performed." *Id*.

The Balanced Membership Plan must be uploaded to the FACA database when the agency files

the Federal advisory committee charter. *Id.*

63.     Each advisory committee must also have a Designated Federal Officer ("DFO")

designated by the agency head. 41 C.F.R. § 102-3.120. A committee's DFO is responsible for

calling meetings of the committee, approving the agenda for all committee meetings, attending

meetings, adjourning any meeting when they determine it to be "in the public interest," and

chairing the meeting when directed by the agency head. *Id.*

64.     FACA demands transparency in the procedures and meetings of advisory

committees. An advisory committee must make publicly available "the records, reports,

transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents .

. . made available to or prepared for or by" the committee. 5 U.S.C. § 1009(b). These materials

must be released well *before* the relevant meeting, so that the public can "follow the substance of

the [committee's] discussions." *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d

1468, 1472 (D.C. Cir. 1992).

65.     Each advisory committee's meetings must be "open to the public," 5 U.S.C. §

1009(a), 41 C.F.R. § 102-3.30, and "held at a reasonable time and in a manner or place

reasonably accessible to the public," 41 C.F.R. § 102-3.140(a)(1). If an advisory committee

meeting is held via teleconference or videoconference, it still must be made accessible to the public. 41 C.F.R. § 102-3.140(a)(5). Meetings must be noticed in the Federal Register at least fifteen days before the meeting is to be held. 41 C.F.R. § 102-3.150(a).

66.    FACA mandates that "[d]etailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee," 5 U.S.C. § 1009(c), and the committee must make available copies of transcripts of advisory committee meetings to "any person," *id.* § 1010. *See also* 41 C.F.R. § 102-3.165 (describing how advisory committee meetings are to be documented with meeting minutes); *Id.* at § 102-3.170 ("Timely access to advisory committee records is an important element of the public access requirements of the Act.").

67.    FACA's transparency obligations extend to a subcommittee or working group of an advisory committee, which must also open its meetings and provide all records to the public if it "makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee." 41 C.F.R. § 102-3.145.

68.    Although portions of meetings may be closed where the President determines that closure is necessary pursuant to 5 U.S.C. § 552b(c) (the federal Sunshine Act), any such determination must be made in a writing that sets forth the reasons for the conclusion. 5 U.S.C. § 1009(d).

## The Administrative Procedures Act

69.    The APA allows a person "suffering legal wrong because of agency action, or adversely aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. §§ 702-

704. Under the APA, a reviewing court may "compel agency action unlawfully withheld or reasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," *id.* § 706(2). Because FACA does not provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA. *See* 5 U.S.C. § 701(a).

## The Freedom of Information Act

70.     FOIA's primary purpose is to improve government transparency and accountability by requiring the disclosure of agency records and information, upon request. It establishes the public's right to access all federal agency records, 5 U.S.C. § 552(a), unless one or more statutory exemptions apply, *id*. § 552(b).

71.     An agency must, within 20 business days of receiving a request, (1) determine if it will release the requested records and (2) notify the requester of (a) its determination and reasons for it, (b) the right to seek assistance from the FOIA Public Liaison, and (c) the right to appeal an adverse determination. 5 U.S.C. §552(a)(6)(A)(i); 5 C.F.R. § 1303.40(a).

72.     There are limited circumstances under which a federal agency may take longer than 20 business days to make a determination. First, an agency may toll the 20 business day deadline up to ten additional business days while waiting for the information reasonably requested by the requester. 5 U.S.C. § 552(a)(6)(A)(ii)(I). Second, the agency may also toll the 20 business day deadline for up to ten additional business days, if needed, to clarify with the requester any issues regarding fee assessment. 5 U.S.C. § 552(a)(6)(A)(ii)(II). Lastly, under "unusual circumstances" the agency may extend the 20 business day deadline if the agency sets "forth the unusual circumstances for such extension and the date on which a determination is

expected to be dispatched." 5 U.S.C. § 552(a)96)(B)(i). However, no extension will exceed ten

business days unless the agency provides written notice to the requester explaining the "unusual

circumstances" requiring an extension, establishes the date on which the agency expects to make

the determination, and gives the requester "an opportunity to limit the scope of the request so

that it may be processed within that time limit or an opportunity to arrange with the agency an

alternative time frame for processing the request or a modified request." 5 U.S.C. §

552(a)(6)(B)(ii). Under FOIA, "unusual circumstances" are defined as "the need to search for

and collect the requested records form field facilities or other establishments that are separate

from the office processing the request[,]" or "the need to search for, collect, and appropriately

examine a voluminous amount of separate and distinct records which are demanded in a single

request," or "the need for consultations … with another agency having substantial interest in the

determination of the request or among two or more components of the agency having substantial

subject-matter interest therein." 5 U.S.C. § 552(a)(6)(B)(iii).

73.    Otherwise, FOIA's mandate to make public records "promptly available" to a

requester requires federal agencies to provide responsive records to a requester within or shortly

after the 20 business day deadline set forth in 5 U.S.C. § 552(a)(6)(A)(i).

74.    Agencies must make a reasonable effort to maintain and search for records so all

responsive records can be identified and reproduced. 5 U.S.C. § 552(a)(3)(B)-(D).

An agency may only withhold responsive records pursuant to nine statutory exemptions.

5 U.S.C. §552(a)(4)(B). These exemptions are narrowly construed given FOIA's primary

objective of disclosure of information, not secrecy.

75.    Even where records may be exempt from disclosure, FOIA expressly requires

agencies to disclose reasonably segregable portions of those records. *Id*. § 552(b).

76.    FOIA grants this Court jurisdiction "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B)

**Mandamus**

77.    Where a plaintiff can "demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists," *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016), "[t]he district courts shall have original jurisdiction" to compel performance of the duty by issuing a writ of mandamus, 28 U.S.C. § 1361.

**FACTUAL BACKGROUND**

**DOGE TEAMS**

78.    On November 12, 2024, then President-elect Donald Trump issued a statement announcing the establishment of the Department of Government Efficiency to be led by Elon Musk and Vivek Ramaswamy to "provide advice and guidance from outside of the government" and to "slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies."

79.    Shortly after, on November 20, 2024, Mr. Musk and Mr. Ramaswamy issued a statement as the heads of the Department of Government Efficiency, entitled "The DOGE Plan to Reform Government," which discusses their plans for across-the-board regulatory recissions, administrative reductions of the federal work-force, and spending reductions to the federal budget on the order of $2 trillion. Mr. Musk and Mr. Ramaswamy described themselves as "entrepreneurs" and "outside volunteers, not federal officials or employees."

80.    On January 20, 2025, President Trump issued Executive Order 14158 titled "Establishing and Implementing the President's 'Department of Government Efficiency'"

("DOGE EO"), renaming the U.S. Digital Service the U.S. DOGE Service ("USDS"), and establishing a new temporary organization known as the U.S. DOGE Service Temporary Organization within the USDS.

81.     The DOGE EO also provides for "DOGE Teams" to be established by each Agency Head in consultation with USDS. These "DOGE Teams" are directed to coordinate with the USDS Administrator, working from within the agencies to advise the Agency Heads on implementing the President's "DOGE Agenda." On information and belief, Mr. Musk has been working as a Special Government Employee in the Office of the White House and has direct control over the work of DOGE and the DOGE Teams.

82.     On February 19, 2025, President Trump issued an additional Executive Order (E.O. 14219) entitled "Ensuring Lawful Governance and Implementing the President's 'Department of Government Efficiency' Deregulatory Initiative," which provides that Agency heads, in coordination with the DOGE Team Leads, are to initiate a process to review and rescind agency regulations deemed unlawful or that "harm the national interest" because they impede technological innovation or infrastructure development.

83.     DOGE and the DOGE Teams therefore have the potential to be used for personal gain, and Mr. Musk and others associated with DOGE stand to benefit personally and financially from the DOGE Teams' work, including by securing government contracts, slashing environmental rules and regulations that apply to their companies, and reducing the government's regulatory capacity and authority, including by targeting specific agencies, statutes, and spending decisions that affect their businesses.

84.     As an example, a former DOGE leader, Mr. Vivek Ramaswamy, stated that DOGE intends to "carefully scrutinize" government loans made to competitors of Mr. Musk's

company Tesla. Mr. Musk has also derided the regulatory authorities that oversee his businesses, including EPA, FAA, and FWS, which Musk's businesses have had conflicts with over permitting and regulatory violations. Mr. Musk also has extensive contracts worth billions of dollars through his own companies like SpaceX that are potentially set to expand under the new administration, and which may be affected by the efforts of the DOGE Teams.

85.     On information and belief, DOGE Teams are operating on both a Department and agency level. Reports indicate that DOGE Teams have already been established within the various Departments and federal agencies controlled by Defendants.

86.     On information and belief, many DOGE Team members are not full-time or permanent part-time government employees.

87.     On information and belief, DOGE and the DOGE teams have been meeting with agency staff and Congressional leaders since November 2024.

88.     On information and belief, the DOGE Teams are responsible for recommending the cutting of thousands of jobs at the Defendant agencies and are undertaking efforts to reduce Defendants' budgets and otherwise undermine their ability to enforce laws and regulations intended to protect public health and the environment.

89.     For example, President Trump's January 20 Executive Order 14156, titled "Declaring a National Energy Emergency," directed the Secretary of Interior and the Secretary of Commerce to work to remove "obstacles" to energy infrastructure, including ESA listings and streamlining approval of energy projects such as mines and pipelines. On information and belief, DOGE Teams are working to provide recommendations and otherwise assist in carrying out these actions.

90.     Recent reports also establish that DOGE team members entered NOAA headquarters, inciting concerns over downsizing the agency, undermining its work to protect communities and the environment, and gaining access to the agency's data. Media reports have stated that the DOGE Team intends to break up the agency and merge it with the Department of Interior—creating confusion and making it more difficult for NOAA to perform its vital and life-saving services like predicting and tracking extreme weather events.

91.     In February, an Associated Press article reported that Elon Musk, through his control over the DOGE Teams, was "rapidly consolidating control over large swaths of the federal government" and "created an alternative power structure inside the federal government for the purpose of cutting spending and pushing out employees."

92.     Even though DOGE Teams will target regulations and spending that protect public health and the environment, on information and belief the DOGE Teams do not and will not consist of anyone representing the environmental or public health advocacy community. The Center communicated this concern to Defendants in its February letters but received no response.

93.     The New York Times has reported DOGE's members communicate using the messaging application Signal, which is widely used for its auto-delete functionality. Any use of Signal by DOGE Teams threatens to irreparably deprive Plaintiffs and the American public of records to which they are entitled, in direct violation of FACA.

94.     DOGE Teams are tasked with and, on information and belief, are providing advice and recommendations that impact millions of Americans, including members of the Center, albeit with none of the transparency, oversight, or opportunity for public participation the law requires. Defendants have provided no charter, Membership Balance Plans, meeting minutes

or other documents regarding the work of the DOGE Teams that FACA requires be made publicly available.

## FOIA REQUESTS

95.     On February 5, 2025, the Center submitted four FOIA requests seeking records from NOAA, DOI, EPA, and USDA requesting the following:

    a.    The communications, emails, and/or other forms of secured messaging (including Signal, WhatsApp, Telegram, X or other platforms) between any individuals within  [NOAA, DOI, EPA, and USDA  or other individual based in headquarters office of the [NOAA, DOI, EPA, and USDA], to or from an individual within the U.S. DOGE Service ("USDS") (formerly known as the U.S. Digital Service), the U.S. DOGE Service Temporary Organization, any other individual purporting to work for DOGE as an employee, "special government employee" or volunteer;

    b.    The communications between any [NOAA, DOI, EPA, and USDA] employee purporting to work within or work with a U.S. DOGE "team" as established by Executive Order 14158 (90 Fed. Reg. 9441, Jan. 29, 2025) and any other member of [NOAA, DOI, EPA, and USDA]; and

    c.    The calendars and/or schedules, including but not limited to travel and/or meeting schedules, of any individual within [NOAA, DOI, EPA, and USDA] purporting to work within or work with a U.S. DOGE "team."

96.     FOIA Defendants were required to make a determination on the Center's FOIA request by March 5, 2025. 5 U.S.C. § 552(a)(6)(A)(i); 5 C.F.R. § 1303.40(a).

97.     To date, the Center has not received any responsive records from the FOIA Defendants.

98.     FOIA Defendants failure to make a timely determination and promptly disclose all responsive records to the Center undermines FOIA's primary purpose of transparency and openness in government.

99.     The Center has substantial, demonstrated interests in FOIA Defendants' communications with USDS, US DOGE Service Temporary Organization, and the DOGE Teams because the DOGE Agenda implemented through these departments and agencies impact air and water quality; climate change; imperiled plants and wildlife; public lands; environmental justice; and other issues of interest to the Center and its members.

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedures Act, 5 U.S.C. § 706 (all Defendants) - Agency action unlawfully held or unreasonable delayed: Failure to Disclose Advisory Committee Materials and to Provide for Ongoing Public Access to Meetings and Documents**

100.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

101.    The DOGE Teams that the DOGE EO required Defendants to establish and that have been, and will be, working within the Defendants' agencies are "advisory committees" as that term is defined under FACA, 5 U.S.C. § 1001. Defendants are responsible for ensuring that the DOGE Teams comply with the express requirements of FACA.

102.    FACA demands transparency and ongoing public access when the executive branch establishes or uses non-federal bodies for the purpose of seeking advice, so that special interest groups may not use their membership on such bodies to promote their private concerns.

103.    FACA therefore requires—*prior* to any meetings or actions being taken by the DOGE Teams—that an advisory committee charter be filed with the head of the agency to whom

the advisory committee reports, along with a Balanced Management Plan. 5 U.S.C. §§ 1004, 1008(c); 41 C.F.R. § 102-3.60(b)(3).

104.    FACA further requires that all meetings of the DOGE Teams be open to the public, and that detailed minutes of each meeting be kept containing a record of the persons present and a complete and accurate description of matters discussed and conclusions reached, and that such meeting minutes be made publicly available along with all records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by the DOGE Teams. 5 U.S.C. §§ 1009, 1010; 41 C.F.R. § 102-3.140.

105.    On information and belief, the DOGE Teams have been actively operating within the Defendants' agencies to implement the President and Mr. Musk's DOGE agenda.

106.    By failing to file and provide the public with a committee charter and Balanced Management Plan for the DOGE Teams, and by failing to make publicly available detailed meeting minutes and all documents prepared by and for the DOGE Teams, Defendants have violated FACA.

107.    Defendants' failure to comply with FACA and, in particular, to ensure that the required documents and records are made available to the public, constitutes final agency action and is agency action unlawfully held or unreasonably delayed, in violation of the APA. *See* 5 U.S.C. § 706(1). A Court order is therefore warranted compelling Defendants to comply with FACA. *Id*. ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.").

**SECOND CLAIM FOR RELIEF**
**Mandamus Relief, 28 U.S.C. § 1361 (all Defendants) – Require Defendants to Disclose Advisory Committee Materials and to Provide for Ongoing Public Access to Meetings and Documents**

108.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

109.    FACA requires that an advisory committee charter and a Balanced Management Plan be filed prior to any meetings or actions being taken by the DOGE Teams, 5 U.S.C. §§ 1004, 1008(c); 41 C.F.R. § 102-3.60(b)(3), and that detailed minutes of each meeting of each DOGE Team be kept and made publicly available along with all documents which were made available to or prepared for or by the DOGE Teams, 5 U.S.C. §§ 1009, 1010; 41 C.F.R. § 102-3.140.

110.    On information and belief, the DOGE Teams have been actively operating within the Defendants' agencies to implement the President and Mr. Musk's DOGE agenda.

111.    Defendants are responsible for ensuring that their DOGE Teams comply with the express requirements of FACA yet have failed provide the public with a committee charter and Balanced Management Plan and have not made any meeting minutes or other documents prepared by and for the DOGE Teams publicly available, as FACA requires.

112.    A writ of mandamus is therefore warranted to compel Defendants to provide Plaintiffs with the information that FACA requires be made publicly available. *See* 28 U.S.C. § 1361.

**THIRD CLAIM FOR RELIEF**
**Violations of the Freedom of Information Act, 5 U.S.C. § 552 (FOIA Defendants) -**
**Failure to Respond to the February 5, 2025, FOIA Requests**

113.    Plaintiff realleges, as if fully set forth herein, each and every allegation contained in the preceding paragraphs

114.    The Center has a statutory right of access to the information and records requested under FOIA, and there is no lawful basis for the FOIA Defendants' withholding of this information.

115.    The FOIA Defendants' failure to disclose the requested information and records responsive to the Center's FOIA Requests violates FOIA, 5 U.S.C. § 552(a)(3), and injures Plaintiff in the manner described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a)  Declare that the DOGE Teams operating within the agencies are advisory committees subject to the requirements of the Federal Advisory Committee Act, 5 U.S.C. § 1001 *et seq*., and that Defendants are responsible for ensuring compliance with FACA;

b)  Declare that the Defendants violated the APA and FACA by failing to file an advisory committee charter and Balanced Management Plan for the DOGE Teams, and by failing to make agendas, minutes, transcripts, and other documents required by FACA available to the public; and issue an order to require Defendants to provide such materials;

c)  Enjoin Defendants from meeting with or otherwise relying on the work of the DOGE Teams unless and until they are brought into full compliance with FACA;

d)  Issue an order of mandamus requiring Defendants to comply with the mandatory duties imposed by FACA.

e)  Enjoin the FOIA Defendants from continuing to withhold, in response to Plaintiff's February 5, 2025, FOIA requests, any non-exempt responsive records and/or segregable portions of otherwise lawfully exempt responsive records;

f)  Order the FOIA Defendants to immediately make determinations on the Center's

    February 5, 2025, FOIA requests;

g)  Retain jurisdiction of this action to ensure the timely processing of the Center's FOIA

    requests and ensure no agency records are improperly withheld;

h)  Award the Center its attorneys' fees and litigation expenses;

i)  Grant other such relief as may be just and proper.


Respectfully submitted this 2nd day of April 2025.

/s/ Lauren A. Parker
Lauren A. Parker DC Bar No. 1670885
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, DC 20005
lparker@biologicaldiversity.org
(202)-868-1008

Jared Margolis *pro hac vice*
Center for Biological Diversity
2852 Willamette St. # 171
Eugene, OR 97405
jmargolis@biologicaldiversity.org
(802) 310-4054

*Attorneys for Plaintiff Center for Biological Diversity*